UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------X
UNITED STATES OF AMERICA, :
:
v. : **MEMORANDUM AND ORDER**
: 18-CR-321 (WFK)
ARTEM ASHIROV, :
:
Defendant. :
-------------------------------------------------------------X

**WILLIAM F. KUNTZ, II, United States District Judge:**

On March 16, 2020, Artem Ashirov ("Defendant") pled guilty to one count of violating the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2), and one count of health care fraud in violation of 18 U.S.C. § 1347. Plea Agreement (the "Plea") ¶ 1, ECF No. 150-7; Superseding Information (the "Information") ¶¶ 34–37, ECF No. 59.[1] The Court now sentences Defendant and provides a complete statement of reasons, under 18 U.S.C. § 3553(c), of those factors set forth by Congress in 18 U.S.C. § 3553(a). For the reasons set forth below, Defendant is hereby sentenced to two (2) years of probation on each Count, to run concurrently, with both the standard and special conditions of supervision; mandatory restitution in accordance with the Order of Restitution, ECF No. 157; forfeiture of U.S. currency identified in the forthcoming Order of Forfeiture; and a $200.00 mandatory special assessment.

## I. Background

### A. Procedural History

On April 20, 2018, the Government filed a then-sealed complaint against Defendant. ECF No. 1. Defendant was arrested in his home on April 23, 2018. PSR ¶ 29. The same day, Defendant was arraigned on the complaint by then-Magistrate Judge Viktor V. Pohorelsky and released on bond. ECF No. 5.

On June 25, 2018, a U.S. Grand Jury returned a then-sealed five-count indictment against Defendant. ECF No. 14. Defendant was arrested on the indictment on June 28, 2018. PSR ¶ 29. The same day, Defendant was arraigned on the indictment by then-Magistrate Judge Ramon E.

[1] Citations are to the docket in *United States v. Ashirov,* 18-CR-321. Page pincites refer to the ECF page numbers assigned to a filing where available, and where no ECF heading is present, to the page numbers listed in the original filing.

Reyes and pled not guilty to all counts. ECF No. 17. Magistrate Judge Reyes also ordered Defendant's bond continued. *Id.*

On March 16, 2020, Defendant waived indictment, ECF No. 58, and the Government filed the Information charging Defendant with one count of violating the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2), and one count of health care fraud in violation of 18 U.S.C. § 1347, Information ¶¶ 34–37. Defendant pled guilty to both counts the same day. Plea ¶ 1.

**B. Factual Background**

Agents from the U.S. Department of Health and Human Services ("HHS") began investigating the instant offenses in late 2017. Presentence Investigation Report (the "PSR") ¶ 7, ECF No. 86.

*i.* *The Kickback Scheme*

Medicare and Medicaid are healthcare programs providing federal and state funding to specific categories of individuals to pay for medical care. *See id.* ¶¶ 8–9. Under both programs, medical providers are authorized to submit claims for services rendered to receive reimbursement. *See id.* ¶ 12. Specifically, medical providers must submit claim forms containing certain important information, such as the beneficiary's name and identification information and the health care benefit, service, or item provided. *Id.* By submitting the claim form, "the provider is certifying, among other things, that the services that were rendered to the patient were medically necessary." *Id.*

Defendant was a licensed pharmacist in New York State and the sole proprietor of ABO Pharmacy Corp. in Brooklyn, New York (the "ABO Pharmacy" or "ABO"). *Id.* ¶ 13. In November 2017, Defendant approached a physician and told him he wanted to "do business" with him. *Id.* ¶ 15. After this initial meeting, Defendant left a packet at the physician's office in

Brooklyn containing $500.00 in cash and advertising materials pertaining to ABO Pharmacy. *Id.* ¶ 16.

Agents from HHS subsequently began to consensually monitor Defendant's conversations with the physician, who was serving as a confidential witness. *Id.* ¶ 16. The physician contacted Defendant to acknowledge he received the packet containing $500.00. *Id.* Defendant then asked whether the physician could help him gain customers at ABO Pharmacy. *Id.*

On December 20, 2017, Defendant went to the physician's office and gave him a bottle of whiskey and two cologne sets. *Id.* ¶ 17. At the meeting, Defendant proposed paying the physician $1,000.00 per month and a percentage of the reimbursements he received from Medicare or Medicaid for prescriptions associated with patients the physician sent to ABO Pharmacy. *Id.* Defendant specifically noted he wanted patients with prescriptions for certain conditions which provided higher reimbursements, such as Hepatitis C and Human Immunodeficiency Virus (HIV). *See id.*

On January 10, 2018, Defendant again met with the physician, and they discussed the specifics of the kickback arrangement, such as sending prescriptions electronically, the physician's flat fee for referrals, and compensation per patient sent to ABO Pharmacy. *Id.* ¶ 18. Defendant also asked the physician to introduce him to more doctors so he could get additional business for the pharmacy. *Id.*

On February 7, 2018, the physician called to tell Defendant he would send beneficiaries to ABO pharmacy and was awaiting bloodwork results from patients to generate prescriptions. *Id.* ¶ 20. On February 12, 2018, the physician generated prescriptions for two undercover agents posing as Medicaid beneficiaries and electronically sent the prescriptions—with three refills

each—to ABO Pharmacy. *Id.* Two undercover officers picked up their initial prescriptions on February 12 and 13, 2018. *Id.*

The physician called Defendant on February 14, 2018, at which time Defendant confirmed the prescriptions had been picked up by the referred beneficiaries (i.e., the undercover officers). *Id.* ¶ 21. On February 22, 2018, the physician and Defendant met at the physician's office. *Id.* ¶ 22. Defendant gave the physician an envelope containing $2,000.00 in cash and suggested the physician write additional prescriptions for specific items, such as pain killers, pain gels and creams, surgical supplies, and durable medical equipment, to generate more billing for ABO Pharmacy. *Id.* Defendant told the physician he would contact him again at the end of March with a list of additional medications he wanted the physician to prescribe to his patients. *Id.*

On March 14, 2018, Defendant approached one of the undercover officers while the officer was picking up a medication refill at ABO Pharmacy. *Id.* ¶ 23. Defendant offered him store credit or items in the pharmacy in exchange for the undercover officer referring other patients to ABO Pharmacy. *Id.* The undercover officer agreed and said he would try to bring additional patients to the pharmacy next time they visited to fill a prescription. *Id.* ¶ 23.

In total, the reimbursement amount for the medications the two undercover officers filled at ABO Pharmacy from the prescriptions written by the physician were $10,810.00. *Id.* ¶ 24.

*ii.* *<u>Defendant's Overbilling of Medicaid and Medicare</u>*

According to the PSR, two separate audits were performed to analyze overbilling pursuant to Count Two. *See id.* ¶¶ 25, 28. One audit evaluated billing claims submitted to Medicare Part D (the "I-MEDIC Loss Analysis"), for top-billed drugs and products, *id.* ¶ 25; and

one evaluated a list of specific drugs being submitted to CVS/Caremark for payment (the "CVS/Caremark Loss Analysis"), *id.* ¶ 28.

*i. I-MEDIC Loss Analysis*

The Investigations Medicare Drug Integrity Contractor ("I-MEDIC") is an entity which performs analyses of a pharmacy's purchase records for prescription drugs, devices, and supplies compared to a pharmacy's billing of claims to Medicare Part D and other insurers. *Id.* ¶ 25. To conduct an external invoice analysis with respect to Medicare, I-MEDIC selects the top-billed drugs by total paid amount to Medicare Part D for a particular time frame and supported by both wholesaler invoices and purchase records. *Id.* If purchases for a specific product or drug are greater than or equal to the billing by the pharmacy, there is no shortage. *Id.*

However, if the pharmacy did not purchase enough of the drug or product compared to the claims submitted by the pharmacy to Medicare Part D (i.e., a shortage), I-MEDIC calculates the approximate dollar loss incurred to Medicare Part D. *Id.* I-MEDIC also evaluates drugs removed from inventory by the pharmacy during the timeframe evaluated, such as drug returns to wholesalers or manufacturers, prescriptions billed, sales to secondary wholesalers, reverse distributors, and a transfer of supply to other pharmacies. *Id.*

In the instant case, I-MEDIC compared Defendant's purchases for ABO Pharmacy between January 2017 and May 2018 to claims billed to Medicare Part D during the same period. *Id.* ¶ 26. Initially, I-MEDIC calculated ABO Pharmacy had a shortage (i.e., overbilled Medicare) by $1.74 million. *Id.* I-MEDIC also identified other discrepancies indicative of fraud, including: 1) over ten percent of records were associated with beneficiary addresses greater than fifty miles from ABO Pharmacy; 2) an atypical list of top drugs and strengths by volume, including alcohol prep pads where no injectable or diabetic drugs were among the top drugs by volume of record

requiring such prep pads; 3) billing records for the most expensive brands of alcohol pads on the market, approximately twenty-three times more expensive than the average alcohol pad; and 4) an unusually high rate of "Dispense as Written" codes, which are written when a (more expensive) brand medication is required in lieu of generic, and indicative of pharmacy-altered prescriptions. *Id.*

After the I-MEDIC findings were presented, Defendant produced additional records. *Id.* ¶ 27. I-MEDIC conducted a new analysis and Defendant's shortage was corrected to $525,256.91 rather than the $1.74 million originally estimated. *Id.* ¶¶ 26–27.

*ii. CVS/Caremark Loss Analysis*

CVS/Caremark also audited Defendant's pharmacy based on specific drugs being submitted to it for payment in 2017. *Id.* ¶ 28. The audit indicated ABO Pharmacy was unable to provide proof of sufficient drug stock purchases for "Lancet Ultr. Mis. Thin," needles generally used for blood sugar testing. *Id.* On October 22, 2018, CVS/Caremark issued its final audit report, stating it found a drug shortage compared to the claims Defendant submitted in the amount of $24,391.15, plus fees. *Id.* CVS later terminated its contract with ABO Pharmacy in 2019. *Id.*

*iii. Post-Plea Agreement Loss Analysis*

The parties disagree as to the extent of overbilling in Count Two.

On February 26, 2026, Defendant submitted his own expert analysis calculating a total loss of $93,938.29: A shortage of only $80,638.29 for the I-MEDIC Analysis, no loss for the CVS/Caremark Analysis, and $13,300.00 associated with the kickback scheme in Count One. Def.'s Obj. to PSR at 2–4, ECF No. 135.

On June 10, 2026, the Government responded to Defendant's proposed calculations, "[a]fter receiving additional documents and records from multiples suppliers [of] ABO Pharmacy[.]" Gov't Resp. to Def.'s Obj. to PSR at 1, ECF No. 144. The Government revised its calculation, indicating it was "prepared to prove by a preponderance of the evidence" the total intended Medicare losses (the I-MEDIC Analysis) were instead $9,220.26 and the CVS/Caremark losses (the CVS/Caremark Analysis) were instead $21,608.19. *Id.* at 1–2. Combined with the $13,310.00 associated with the kickback scheme in Count One, the Government's newly calculated "total intended. loss" was "at least $44,138.45." *Id.* at 2.

On August 12, 2026, Defendant filed his sentencing submission and conceded to the Government's proposed I-MEDIC loss of $9,220.26 and $13,310.00 in losses stemming from the kickbacks in Count One. *See* Def.'s Sent'g Mem. at 11, ECF Nos. 150, 152.[2] However, Defendant argued—due to "the [G]overnment's inability to provide sufficient documentation to support the recent claim of a CVS/Caremark loss of $21,608.19"—the loss figure for the CVS/Caremark Analysis should instead be "greater than $15,000[.00]" but less than $40,000.00. *Id.* Defendant alleged this discrepancy was primarily due to a failure to prove a shortage of 578 boxes of lancets. *Id.* at 5. In relevant part, Defendant argued CVS/Caremark used a faulty methodology by "neglect[ing] to consider ABO Pharmacy's substantial purchases of . . . Lancets immediately preceding the beginning date of the audit period of December 1, 2016."[3] *Id.* at 6–7.

On August 19, 2026, the Government filed its sentencing submission and "maintain[ed] its estimate of losses to CVS/Caremark of $21,608.19 based on CVS/Caremark's final audit finding." Gov't Sent'g Mem. at 3, ECF No. 153; *see also* Gov't Sent'g Mem., Ex. A, ECF No.

---

[2] Defendant originally submitted his memorandum on August 12, 2026, but later re-filed the memorandum and an accompanying exhibit to correct the date listed in the filings.

[3] Defendant also argued the Government failed to prove these transactions were "fraudulent." Def.'s Resp. to Gov't Sent'g Mem. at 3–4, ECF No. 155

153-1. The Government highlighted Defendant's stipulation in the Plea "after negotiation . . . 'that the total loss amount is more than $250,000[.00], but [that Defendant] reserve[d] the right to argue that the loss is less than $1,500,000[.00]." *Id.* at 3; Plea ¶ 2. The Government argues precedent from the U.S. Court of Appeals for the Second Circuit establishes "a knowing and voluntary loss stipulation in a plea agreement generally governs the parties' positions concerning loss and constitutes a promise by the defendant not to contest the stipulated amount." *Id.* at 4–5 (citing *United States. v. Granik*, 386 F.3d 404, 411–13 (2d Cir. 2004)).

Furthermore, the Government relied on the final audit findings from CVS/Caremark, which were "the result of a year-long audit in which [Defendant], represented by counsel, provided records and argument ultimately concluding in that final loss calculation by CVS/Caremark." *Id.* at 5. In response to Defendant's contention that the Government "cannot independently verify the accuracy or reliability of" that audit, the Government warns these arguments are "entirely speculative and invite a cycle of examining ABO's earlier reimbursement requests and wholesaler purchases back to the formation of the business." *Id.* at 5–6. The Government also argues "there is no evidence that CVS/Caremark failed to consider pre-existing inventory during its audit." *Id. a*t 6.

On August 20, 2026, the U.S. Probation Office ("Probation") filed a Second Addendum to the PSR (the "Sec. Add. PSR") consistent with the Government's new loss calculation. *See* Sec. Add. PSR at 2; ¶ 36.

On August 24, 2026, Defendant filed a letter in response to the Government's sentencing submission. *See* Def.'s Resp. to Gov't Sent'g Mem., ECF No. 155. Defendant reiterated the CVS/Caremark audit did not consider pre-existing inventory which would have accounted for the calculated shortage, and highlighted records of lancet purchases from August 25, 2016, until

November 14, 2016. *Id.* at 2. Defendant further argued "there is evidence that CVS/Caremark deliberately limited record production to the audit period and precluded documentary proof of pre-existing inventory." *Id.* at 3.

Defendant also asserted CVS/Caremark "randomly took 578 separate claims for the purchase [of] one box of Lancets from the total amount claimed in all the billings submitted during the audit period, and decided not to pay these 578 claims because of an audit discrepancy[.]" *Id.* at 3–4. However, Defendant argues there is no proof these transactions were fraudulent; according to Defendant, "[t]he failure to ascertain whether the customer or purchaser of the Lancets either received the Lancets listed in the claim for payment, thus a lawful transaction, or failed to receive the Lancets, confirming the false nature of the claim, is a fatal flaw in the audit findings." *Id.* at 4.

## II. Legal Standard

Congress set forth the procedures for imposing a sentence in a criminal case in 18 U.S.C. § 3553. Together with 18 U.S.C. § 3553, the Guidelines operate as the "starting point and . . . initial benchmark" for a court evaluating a criminal sentence. *Gall v. United States*, 552 U.S. 38, 49 (2007). If and when a trial court chooses to impose a sentence outside of the Sentencing Guidelines range, the court "shall state, in open court, the reasons for its imposition of the particular sentence, and . . . the specific reason for the imposition of a sentence different from that described" in the Guidelines. 18 U.S.C. § 3553(c)(2). The court must also "state[] with specificity" its reasons for so departing "in a statement of reasons form." *Id.* The court's statement of reasons "shall be a simple, fact-specific statement explaining why the guidelines range did not account for a specific factor or factors under § 3553(a)." *United States v. Davis*,

08-CR-332, 2010 WL 1221709, at *1 (E.D.N.Y. Mar. 29, 2010) (Weinstein, J.) (internal citation omitted).

When determining the appropriate sentence, the Court must consider seven different factors: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed; (3) the kinds of sentences available; (4) the kinds of sentence and the sentence range established by the Guidelines; (5) any pertinent policy statements issued by the U.S. Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records found guilty of similar conduct; and (7) the need to provide restitution to victims of the offense. *See* 18 U.S.C. § 3553(a). The Court now addresses each factor in turn.

## III. Analysis

### A. The Nature and Circumstances of the Offense and the History and Characteristics of Defendant

The first § 3553(a) factor requires the Court to evaluate "the nature and circumstances of the offense and the history and characteristics of the defendant[.]" 18 U.S.C. § 3553(a)(1).

*1.* *Family and Personal Background*

Defendant was born on July 5, 1976, to the marital union of his father, Abo Ashirov, and his mother, Roza Khanimova. PSR ¶ 52. He grew up in a middle-income household in Dushanbe, the capital city of Tajikistan. *Id.* ¶ 54. Defendant described his childhood as "amazing" prior to the Tajik civil war and collapse of the Soviet Union. *Id*. After the outbreak of the war, his life was "dramatically different" due to the closure of schools and persecution based on his religion. *Id.* Defendant's family ultimately immigrated to the United States as religious refugees in 1993 and settled close to relatives in Queens, New York. *Id.*

Records from the U.S. Immigration and Customs Enforcement Agency indicate Defendant entered the United States on January 6, 1993, and was naturalized on February 6, 2000, in Brooklyn, New York. *Id.* ¶ 58.

Defendant reports a good relationship with both his parents and siblings, all of whom are aware of the instant case and remain supportive. *See id.* ¶¶ 52–54. Defendant's father and mother are both in their late seventies, reside in Queens, New York, and suffer from chronic health conditions. *Id.* ¶ 52. Defendant also has two brothers, Boris and Artur, both of whom reside in Queens, New York. *Id.* ¶ 53.

In the late 1990s, Defendant met Angela Borukhova through work and the couple later married in a religious ceremony in 2003. *Id.* ¶ 55. However, Borukhova stated the couple is not legally married. *Id.* Borukhova is in good health and works part-time as a pharmacist. *Id*. She is aware of the instant case and remains supportive, describing Defendant as "a caring husband, a loving father, and a person who still has much to contribute[.]" Def's Sent'g Mem., Ex. 24 at 4, ECF No. 150-27. The couple share three children: Rozalina, Ariella, and David. PSR ¶ 56.

Defendant received letters of support from family, friends, former employees, business associates, and other members of his community. *See* Def.'s Sent'g Mem. Exs. 5–27. Defendant himself also submitted a letter. The Court has reviewed and carefully considered each of these letters.

*2.* *Educational and Employment History*

Defendant received his high school diploma from the Binat Chaim School in 1995. *Id.* ¶ 63. Defendant then attended St. John's University, where he graduated with a bachelor's degree in Pharmacy in 2001. *Id.* Defendant subsequently obtained his pharmacy license in February of 2002. *Id.* ¶ 64.

As for employment, Defendant reports working part-time throughout college, both as an intern at Mt. Sinai Hospital and for his brother's butcher shop. *Id.* ¶ 70.

From approximately 1996 until 2006, Defendant worked at various Walgreens Pharmacy locations in Queens and Long Island, earning approximately $100,000.00 per year. *Id.* ¶ 69.

From April 2006 until September 2018, Defendant owned and served as chief pharmacist for ABO Pharmacy in Brooklyn, New York, the business at issue in the instant case. *Id.* ¶ 68. During this time, his income varied from as low as $50,000.00 to as high as $800,000.00 per year. *Id.* The business was sold in September 2018 following Defendant's arrest. *Id.*

From September 2018 until the present, Defendant has been unemployed, supporting himself by personal savings. *Id.* ¶ 67. Defendant reports volunteering at his synagogue and working "for his brother's car wash[,]" but reports no specific income from either of these activities. *Id.*

Probation concludes—based on his financial circumstances and the priority of restitution—Defendant appears unable to pay a fine. *Id.* ¶ 76.

*3.* *Prior Convictions*

Defendant has no prior convictions or arrests, and no other pending charges against him. *Id.* ¶¶ 45–50.

*4.* *Physical and Mental Health*

Defendant reports no "chronic or serious physical health problems[.]" *Id.* ¶ 60. Defendant also indicated he has no prior or current mental health issues. *Id.* ¶ 61.

*5.* *Substance Abuse*

Defendant reports no history of illegal drug use or alcohol abuse. *Id.* ¶ 62.

**B. The Need for the Sentence Imposed**

The second § 3553(a) factor instructs the Court to consider "the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]" 18 U.S.C. § 3553(a)(2).

The Court's sentence recognizes the seriousness of Defendant's conduct. "Fraud against the Medicare program is a serious offense that targets national programs relied on by millions of Americans" including the poor and the elderly. Gov't Sent'g Mem. at 7–8. As noted by the Government, the crimes charged "[were] not a momentary lapse of judgment[,]" but instead "serious and deliberate crimes, perpetrated over years[.]" *Id.* at 7.

The Court's sentence will deter Defendant and others from engaging in similar conduct, justly punish Defendant for his crimes, and protect the public from Defendant's actions. Accordingly, the Court's sentence is "sufficient, but not greater than necessary" to comply with the purposes set forth in this factor. 18 U.S.C. § 3553(a)(2).

**C. The Kinds of Sentences Available**

The third § 3553(a) factor requires the Court to detail "the kinds of sentences available" for Defendant. 18 U.S.C. § 3553(a)(3).

Defendant pled guilty to one count of violating the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2). Plea ¶ 1 (Count One). Defendant faces a maximum term of ten years' incarceration and no minimum term. 42 U.S.C. § 1320a-7b(b)(2). Defendant also faces a maximum term of three years of supervised release. 18 U.S.C. § 3583(b). If a condition of

release is violated, Defendant may be sentenced to up to two years of incarceration without credit for pre-release incarceration or time previously served on post-release supervision. 18 U.S.C. §§ 3583(e).

Defendant also pled guilty to one count of health care fraud in violation of 18 U.S.C. § 1347. Plea ¶ 1 (Count Two). Defendant faces a maximum term of ten years' incarceration and no minimum term. 18 U.S.C. § 1347. Defendant also faces a maximum term of three years of supervised release. 18 U.S.C. § 3583(b). If a condition of release is violated, Defendant may be sentenced to up to two years of incarceration without credit for pre-release incarceration or time previously served on post-release supervision. 18 U.S.C. §§ 3583(e).

Multiple terms of supervised release shall run concurrently. 18 U.S.C. §3624(e). Furthermore, Defendant is eligible for a term of probation of one to five years per count. 18 U.S.C. § 3561(c)(1). Unless extraordinary circumstances exist, the Court must impose one of the following as a condition of probation: a fine, restitution, or period of community service. 18 U.S.C. § 3563(a)(2).

In addition to facing terms of incarceration, probation, and supervised release, Defendant faces a maximum fine of $100,000.00 for Count One, and a maximum fine of $250,000.00—or twice the gross gain or twice the gross loss—for Count Two. 42 U.S.C. § 1320a-7(b)(2); 18 U.S.C. § 3571(b)(2), (b)(3), (d).

**D. The Kinds of Sentence and the Sentencing Range Established for Defendant's Offense**

The fourth § 3553(a) factor requires the Court to discuss "the kinds of sentence and the sentencing range established for . . . [t]he applicable category of offense committed by the applicable category of defendant as set forth in the guidelines[.]" 18 U.S.C. § 3553(a)(4)(A).

Pursuant to the U.S. Sentencing Guidelines (the "Sentencing Guidelines," or "Guidelines," or "U.S.S.G."), the Government and Defendant stipulated to an estimated Total Adjusted Offense Level of 21 in the Plea.[4] *See* Plea ¶ 2.

Additionally, all parties agree Defendant has a Criminal History Category of I. Sec. Add. PSR ¶ 78; Gov't Sent'g Mem. at 4; Def.'s Sent'g Mem. at 9; Plea ¶ 2.

As for the Total Adjusted Offense Level, all parties appear to agree Counts One and Two should be grouped pursuant to U.S.S.G. § 3D1.2(b), which groups closely related counts when they "involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common criminal scheme or plan." *See* U.S.S.G. § 3D1.2(b); Sec. Add. PSR ¶ 34; *see generally* Gov't Sent'g Mem. (raising disagreement solely to loss amount calculation); Def.'s Sent'g Mem. (same).

Furthermore, all parties agree the applicable Guidelines provision—after grouping—is U.S.S.G. § 2B1.1, which calls for a Base Offense Level of 6. Sec. Add. PSR ¶ 35; Gov't Sent'g Mem. at 4; Def.'s Sent'g Mem. at 11 (using Base Offense Level of 6 as opposed to U.S.S.G. § 2B4.1's Base Offense Level of 8); Plea ¶ 2.

As previously mentioned, the parties disagree as to the appropriate loss amount. *See supra* § B.3. Pursuant to U.S.S.G. § 2B1.1(b)(1), Defendant argues a four-level enhancement is appropriate because the loss is greater than $15,000.00 but less than $40,000.00. U.S.S.G. § 2B1.1(b)(1)(C); Def.'s Sent'g Mem. at 11. The Government and Probation argue a six-level

---

[4] The parties initially calculated a Subtotal Adjusted Offense Level of 24. *See* Plea ¶ 2. The estimated Total Adjusted Offense Level the parties stipulated to is 21 because the Subtotal Adjusted Offense Level was subject to a two-level reduction "[i]f [Defendant] clearly demonstrate[d] acceptance of responsibility," and a one-level reduction "if [Defendant] . . . accepted responsibility as described" in the Plea, "to the satisfaction of the [Government], and if [he] ple[d] guilty on or before March 16, 2020[.]" *Id.* Despite these Guidelines stipulations, "[Defendant] stipulate[d] that the total loss amount is more than $250,000[.00], but reserve[d] the right to argue that the loss is less than $1,500,00[.00]." *Id.*

enhancement is appropriate because the loss is greater than $40,000.00 but less than $95,000.00. U.S.S.G. § 2B1.1(b)(1)(D); Sec. Add. PSR ¶ 36; Gov't Sent'g Mem. at 4.

The parties agree certain mitigating factors and an enhancement should apply as to Defendant.

As for enhancements, the parties agree Defendant is subject to a two-level enhancement for the abuse of public trust pursuant to U.S.S.G. § 3B1.3. Def.'s Sent'g Mem. at 11; Sec. Add. PSR ¶ 38; Gov't Sent'g Mem. at 4

As for mitigating factors, the parties agree a two-level reduction for the timely acceptance of responsibility is appropriate pursuant to U.S.S.G. § 3E1.1(a). *See* Sec. Add. PSR ¶ 41; Gov't Sent'g Mem. at 4; Def.'s Obj. to PSR at 4; Def.'s Sent'g Mem. at 11; Plea ¶ 2.[5]

The parties also agree a two-level reduction should apply because Defendant is a Zero-Point Offender pursuant to U.S.S.G. § 4C1.1(a)–(b). *See* Sec. Add. PSR ¶ 43; Gov't Sent'g Mem. at 4; Def.'s Obj. to PSR at 4; Def.'s Sent'g Mem. at 11.

Because the parties disagree as to Defendant's Total Adjusted Offense Level, the recommended Guidelines ranges vary. Probation and the Government agree, pursuant to the Guidelines Sentencing Table, a Total Adjusted Offense Level of 10 and a Criminal History Category of I results in a Guidelines range of six (6) to twelve (12) months' incarceration. U.S.S.G. § 5A; Gov't Sent'g Mem. at 4; Sec. Add. PSR ¶ 78. Defendant calculates a Total Adjusted Offense Level of 8 which, with a Criminal History Category of I, results in a Guidelines range of zero (0) to six (6) months' incarceration. U.S.S.G. § 5A; Def.'s Sent'g

[5] The parties originally agreed an additional one-level reduction would be appropriate pursuant to U.S.S.G. § 3E1.1(b); however, because all parties agree the Total Adjusted Offense Level is less than 16, this reduction does not apply. *See* PSR ¶ 43; Plea ¶ 2; U.S.S.G. § 3E1.1(b).

Mem. at 11. Both Guidelines ranges are subject to a ten-year statutory maximum for each count pursuant to 42 U.S.C. § 1320a-7b and 18 U.S.C. § 1347. *See* Plea ¶ 1.

This Court appreciates the sentencing arguments raised by all parties and seriously considered each in turn.

**E. Pertinent Policy Statement(s) of the Sentencing Commission**

The fifth § 3553(a) factor requires the Court to evaluate "any pertinent policy statement . . . issued by the Sentencing Commission." 18 U.S.C. § 3553(a)(5).

Defendant draws the Court's attention to "the new guideline commentary to U.S.S.G. § 5C1.1 . . . provides a presumption against imprisonment for a defendant . . . who is a zero-point offender and whose guidelines range is in Zone A [or B] of the Sentencing Table[.]" Def.'s Sent'g Mem. at 11; *see also* Commentary Note 9, U.S.S.G. § 5C1.1 ("If the defendant received an adjustment under [U.S.S.G. § 4C1.1] (Adjustment for Certain Zero-Point Offenders) and the defendant's applicable Guidelines range is in Zone A or B of the Sentencing Table, a sentence other than a sentence of imprisonment . . . is generally appropriate.").

This Court appreciates and seriously considered the above provision raised by Defendant. Finding no other pertinent policy statements on its own, the Court proceeds to the next § 3553(a) factor.

**F. The Need to Avoid Unwarranted Sentence Disparities**

The sixth § 3553(a) factor requires the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]" 18 U.S.C. § 3553(a)(6).

The parties do not raise any arguments related to unwarranted sentencing disparities. For the reasons stated in this Memorandum and Order, and considering the other six § 3553(a) factors, the Court's sentence avoids unwarranted sentencing disparities.

**G. The Need to Provide Restitution**

Finally, the seventh § 3553(a) factor requires the Court to touch upon "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(7). At sentencing, the Court ordered Defendant to pay $9,220.26 in mandatory restitution. *See* Order of Restitution.

## IV. Conclusion

For the reasons set forth above, the Court sentences Defendant to two (2) years of probation on each Count, to run concurrently, with both the standard and special conditions of supervision; mandatory restitution in accordance with the Order of Restitution; forfeiture of U.S. currency identified in the forthcoming Order of Forfeiture; and a $200.00 mandatory special assessment. This sentence is sufficient, but not greater than necessary, to accomplish the purposes of § 3553(a). The Court does not impose a fine given Defendant's present financial circumstances.

The Court expressly adopts the factual findings of the PSR and addenda thereto, as corrected herein, to the extent those findings are not inconsistent with this opinion. The Court advises Defendant he has fourteen (14) days to appeal the order and judgment of this court from the date the order and judgment are entered.

**SO ORDERED.**

**s/WFK**
HON. WILLIAM F. KUNTZ, II
UNITED STATES DISTRICT JUDGE

Dated: August 27, 2026
Brooklyn, New York